OPINION OF THE COURT
Joseph Harris, J.
In each of the cases herein the People move for an order to extract blood from the respective defendant for the purpose of comparing the DNA[1] therein with DNA contained in biologi *307 cal evidence reasonably believed to be relevant in each respective case. In People v Bailey, the defendant is charged with rape in the first degree; the evidence believed to be relevant is an aborted fetus. In People v Wesley, the defendant is charged with burglary in the second degree and suspected of murder in the second degree. Bloodstained clothing was retrieved from the defendant; the People proposed to compare the DNA contained in said bloodstains with DNA extracted from the deceased victim and for control purposes with DNA to be extracted from a known blood sample of defendant Wesley.
The process sought to be used by the People is colloquially and most frequently referred to in forensic science as "DNA fingerprinting”,[2] by which name the test will in this decision be hereinafter called.[3]
DNA fingerprinting is at the "cutting edge” of forensic science, just as molecular biology and genetic engineering are at the "cutting edge” of revoluntionary applications in medicine and control of such genetic or genetic-influenced diseases as diabetes, diverse forms of cancer, muscular dystrophy, Down’s Syndrome, and Acquired Immune Deficiency Syndrome (AIDS).
DNA fingerprinting is a genetic and molecular biological process that has its basis in the fact that each individual has an entirely unique genetic "signature”, derived in turn from the fact that the over-all configuration of the DNA, found in every cell in the human body (and for that matter, in every living organism) containing a nucleus — over 99% of the cells of the human body[4] — is different in every individual except in the case of identical twins. This fact is not only generally *308 accepted by the scientific community to which it is related, but is uniformly accepted therein.
Related to this fact and fully accepted by the scientific community is the further fact that in each individual the configuration of DNA contained in one cell is the same for every cell in the body of that individual.[5] Thus, for the purpose of DNA fingerprinting, DNA for comparative purposes can be obtained from blood, semen, hair roots, skin, and indeed from over 99% of the cells of the human body.
The immediate advantage of DNA fingerprinting, in addition to its ability to utilize a vaster source of obtainable biological evidence than heretofore was the case — practically any portion of the human body — is the claimed certainty of identification. Blood-grouping identification tests often can narrow down the number of suspects to from 30 to 40% of the population. The laboratory the People propose to utilize claims a mean power of certainty of identification for American Whites of 1 in 840,000,000; for American Blacks, 1 in 1.4 billion. There are approximately only five billion people in the entire world.
The overwhelming enormity of these figures, if DNA fingerprinting proves acceptable in criminal courts, will revolutionize the administration of criminal justice. Where applicable, it would reduce to insignificance the standard alibi defense. In the area of eyewitness testimony, which has been "claimed to be responsible for more miscarriages of justice than any other type of evidence, again, where applicable, DNA fingerprinting would tend to reduce the importance of eyewitness testimony. And in the area of clogged calendars and the conservation of judicial resources, DNA fingerprinting, if accepted, will revolutionize the disposition of criminal cases. In short, if DNA fingerprinting works and receives evidentiary acceptance, it can constitute the single greatest advance in the "search for truth”, and the goal of convicting the guilty and acquitting the innocent, since the advent of cross-examination.
Further, the compilation of a DNA fingerprint data base, such as that in existence for ordinary fingerprints, will enormously enhance the ability of law enforcement to reduce the number of unsolved crimes that currently occur daily.
The matter of the admissibility of DNA fingerprinting as a *309 contested issue in the courts of the State of New York is a matter of first impression. Thus it was necessary herein that a Frye hearing be held to determine the admissibility of this new kind of scientific evidence. Because of the above and other overwhelming implications of DNA fingerprinting, it was necessary that this hearing be both extensive and intensive, so that a record be produced of a quality and thoroughness sufficient for the Court of Appeals ultimately to decide this matter. This resulted in a sharply contested hearing commencing December 11, 1987, and continuing on diverse dates thereafter, entailing the testimony of numerous witnesses prominent in the scientific fields of molecular biology, population genetics, and other diverse areas of genetics and human genetics, producing a transcript of over a thousand pages.
THE LAW
The ultimate standard for the admission of scientific evidence in the State of New York, even though refinements have been added by the appellate courts of the State of New York, is Frye v United States (293 F 1013 [Dec. 3, 1923]). In that case the Court of Appeals of the District of Columbia stated: "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.” (Supra, at 1014.)
In People v Middleton (54 NY2d 42, 49 [1981]) the New York Court of Appeals refined the Frye standard, stating "the test is not whether a particular procedure is unanimously indorsed by the scientific community, but whether it is generally acceptable as reliable.”
THE SCIENCE — THEORY, PRINCIPLES AND TECHNOLOGY

A Genetic and Biological Primer

The particular scientific fields that govern DNA fingerprinting are molecular biology, genetics, and a specialized branch of genetics known as population genetics.
In order to understand DNA fingerprinting it is helpful to *310 have a basic knowledge of genetics and cellular biology. To this end the court presents the following brief genetic and biological primer:[6]
A cell is the basic unit of all living organisms — including animals, plants, insects, and people. The human body has more than 10 trillion cells.
A cell has two main parts — the nucleus and the cytoplasm. The nucleus contains two important types of structures: chromosomes and nucleoli. The cytoplasm is all the material inside the cell membrane outside the nucleus.
The nucleus contains the cell’s genetic program, a master plan that controls almost everything the cell does. It sends instructions to the cytoplasm, which is the cell’s chemical "factory”, to take amino acids and build proteins — to construct an arm, a leg, a head, and ultimately a total, functioning human body.
A chromosome is composed mainly of DNA and associated proteins and stores and transmits genetic information. In each human cell there are 46 chromosomes, arranged in pairs of 22 plus 2 sex chromosomes (represented by X for female and Y for male).
DNA is an abbreviation for deoxyribonucleic acid, its chemical structure. It is a molecule that carries the body’s genetic information. It is contained in every .cell with a nucleus in every living organism.
In 1953 James Watson, an American scientist, and Francis Crick, a British scientist, working together at Cambridge University in England, discovered the chemical and spatial structure of the DNA molecule. It was a "double helix” in which two chains of nucleotides, running in opposite directions, are held together between pairs of bases reminiscent of the rungs of a ladder, and coiled like a spring. It looks like a twisted rope ladder or a spiral staircase. Wherever their derivation — human, animal or vegetable — all DNA molecules have this shape.
The long threads that make up the sides of the DNA ladder are made up of alternating units of phosphate and sugar called deoxyribose. The "rungs” of the "ladder” are made up of four compounds called bases. These bases are adenine, *311 cytosine, guanine, and thymine (abbreviated A, C, G, and T). They are attached to the sugar units of the ladder’s side pieces. Each rung consists of two bases: A-T, T-A, C-G, or G-C, held together by hydrogen bonds, a weak form of chemical bond. No other combination is possible because only the A-T and C-G pairs are chemically attracted to each other; that is, A can only link with T, and C can only link with G. (See, figure 1, at 312.)
The order of the bases in one strand of the DNA ladder determines the order of the bases in the other strand. For example, if the bases in one strand of the ladder are ACTAGT, the bases in the opposite strand would be TGATCA.
Each rung on the DNA ladder is known as a "base sequence”, or a "base pair”, and constitutes a bit of information. There are approximately three billion bits of information, or base sequences, in a molecule of DNA — that is, the genetic code in the nucleus of each cell of the human body consists of approximately three billion bits of information. The DNA molecule is tightly coiled within the nucleus of a cell like a ball of yarn. Unraveled, a molecule of DNA is approximately six feet in length.
*312 FIGURE 1
[[Image here]]
Alternating units of sugar and phosphate form the sides of the DNA ladder, while base pairs (A-T and G-C) form the ladder's rungs. T unites exclusively with A, and G unites exclusively with C.
© 1986, Copyright, Lifecodes Corporation.
*313 A sequence of three bases on the DNA molecule is known as a codon. Groups of codons form genes. A gene is a unit of inheritance composed of a segment of DNA and carrying coded information associated with a specific function. It contains a certain number of base pairs in a certain order. The instructions for making specific proteins from the 20 amino acids contained in a cell are carried by specific genes.
The genetic code lies in the order of the bases in the DNA molecule, organized in genes. This order of bases is passed on from one generation of cells to the next and from one generation of an organism to the next. It causes a rhinoceros to give birth to a rhinoceros and not to an ant.
Every human being inherits half of its genes from each of its parents. It is the order of the base sequences, organized in genes, that determines all of the characteristics of a living organism — the color of our eyes, the shape of our ears, and thousands of other traits. Within the DNA in the nucleus of every cell in the human body is all the genetic information needed to form another human body.
Each gene is a continuous segment of DNA along the molecule and is located at a specific site, known as a locus, upon a specific chromosome. Genes may be of different lengths and follow one another along the DNA molecule. Each gene differs from the next because the sequence or order of base pairs in one gene is not identical to the following one. There is no restriction on which base pair must necessarily follow another. The only restriction is that an A base (adenine) on one strand of the DNA molecule must connect with, and only with, a T base (thymine) on the other strand, and a C base (cytosine) on one strand must connect with, and only with, a G base (guanine) on the other strand.
THE GENETIC EXPLOSION
The discovery of the structure of DNA by Watson and Crick, recognized as one of the major scientific events of the twentieth century, caused an explosion in biochemistry, molecular biology and related sciences, and the technology thereof. Among its vast biological implications are mindboggling applications to medical diagnostics and forensic identification.
Now knowing the structure of DNA, and its immutable rules, and knowing that genetic information and instructions are transmitted by varying sequences of matched base pairs, molecular scientists were able to decipher much of the genetic
*314 codes. In 1970 there was isolated the first enzyme, known as a restriction endonuclease, or restriction enzyme, that cuts DNA molecules at specific sites. A flood of other restriction enzymes were thereafter identified and used to segment the strands of the DNA molecule. No laboratory in the world was more instrumental in this development than a laboratory known as the Cold Spring Harbor Laboratory in Long Island, New York.
Other major developments in DNA technology occurred, leading to enhanced methods of sequencing or fragmenting DNA and enabling the examination of specific fragment lengths of the DNA molecule.
DNA researchers were soon able to identify and map the location on the chromosomes of many genes and alleles (alternative forms of genes, as, for example, alternative genes that determine eye color pursuant to Mendelian rules of inheritance). Every two years a prestigious group of international scientists meets in a body known as the Human Gene Mapping Conference, receives applications for the acceptance, mapping, and publication of gene sites newly discovered since the last meeting of said body. The Human Gene Mapping Conference is uniformly recognized by the scientific community as the official registrar of gene sites. Few scientists are more active in the work of the Human Gene Mapping Conference than Dr. Kenneth Kidd, a molecular biologist and population geneticist, and currently a professor of human genetics, psychiatry and biology at Yale University School of Medicine, and chairman of the DNA Committee for the next scheduled meeting of the Human Gene Mapping Conference.
The Human Gene Mapping Conference assigns a locus for every gene site accepted by it. A locus is the specific position occupied by a particular gene or alternative forms of a gene on a chromosome.
DNA FINGERPRINTING
Long segments of DNA are the same from person to person. These are the genes whose functions are known — to build the necessary organs that characterize the organism it controls— in a human being, a head, lungs, a heart, limbs, and the like. However, certain areas of the DNA are highly variable from one person to another. These areas are called polymorphisms.
These areas contain what is called "anonymous sequences” or "junk DNA” by reason of the fact that their function is not clearly understood. These highly variable or polymorphic *315 regions, or sequences, of DNA provide the basis for DNA fingerprinting. Because of these polymorphic regions, the DNA from no two people, outside of identical twins, contains the same sequential pattern.[7]
DNA fingerprinting, as applied to forensic identification, involves essentially six steps, all the scientific principles and technology of which have gained general acceptance in the scientific field in which they belong:
(1) Extraction of DNA. The DNA is chemically extracted from the submitted evidentiary sample — semen found in the victim, blood, hair, or any other tissue thought to originate from the perpetrator of the crime — and purified.
(2) Fragmentation by restriction enzymes. The DNA is then cut into fragments. The "molecular scissors” used to cut the DNA are called restriction endonucleases, or restriction enzymes — enzymes that cleave the DNA molecule at specific base sequences; routinely, a restriction enzyme will cut everyone’s DNA in the same places, resulting in same-size fragment lengths — however, in every person’s DNA, variable lengths of repetitive "junk DNA” periodically turn up. In those areas the cut points get shifted, resulting in fragments of varying lengths.
(3) Gel electrophoresis. The fragments of DNA are then subjected to a technique widely accepted by the scientific community, and much used particularly by molecular biologists, known as "gel[8] electrophoresis”; the purpose of this process is to arrange or line up the fragments of DNA according to length, for later comparative purposes. The process of gel electrophoresis essentially consists of placing the DNA fragments on an electrically charged flat gelatin surface containing agarose gel, a thick jello-like substance, full of holes; at one end of this surface is a positively charged electric pole and at the other end a negatively charged pole; because DNA carries a negative charge, and because opposite electrical charges attract, the DNA fragments will travel from the negatively charged end toward the positively charged end; the *316 distance the fragments travel depends on their length — the larger fragments, being bulkier than the shorter fragments, find it more difficult to worm their way through the holes in the agarose gel, and will not travel as fast or as far, remaining closer to the negative pole, while the shorter fragments will arrange themselves closer to the positive pole. The result is an orderly arrangement of the DNA fragments along parallel lines.
(4) Southern blotting. The double-stranded DNA fragments are then chemically split apart into two strands, leaving their chemical bases (A, C, G and T) separated like open zipper teeth; the fragment pattern is then transferred from the wobbly surface of the agarose gel onto a sheet of nitrocellulose (or a nylon membrane), which resembles a sheet of heavy blotting paper. This procedure is known as Southern blotting, after Dr. E. H. Southern, who reported the process in 1975.
(5) Hybridization. To identify the aspects of the DNA pattern unique to each individual, "probes”,[9] developed in the laboratory by the use of recombinant DNA technology,[10] are applied to the nitrocellulose membrane. These probes are tagged with a radioactive marker substance and are designed to seek out a predetermined locus in a polymorphic (highly variable) region of the DNA. Upon finding a DNA fragment that carries all or part of its complementary base sequence, the probe will bind to the fragment. The marker component of the probe will cause the probe-bound fragments to "light up”, allowing easy identification of their positions in the fragment pattern. To enhance the power of identity, Lifecodes uses four probes in its DNA Print Identification test.
(6) Autoradiograph. The excess probe is then washed away and the nitrocellulose sheet is placed against a piece of X-ray film and exposed for several days. When the film is processed, black bands appear where the radioactive probes stuck to the fragments. All of the four probes used by Lifecodes produce an average of two dark bands on a white column, looking much like the bar codes found on food packages in supermarkets. This is known as an autoradiograph, which term is often shortened to autorad.
*317 All of the procedures hereinabove constituting DNA fingerprinting are recognized as reliable and have gained general acceptance in the scientific community in which they belong.
When comparing two DNA fragment patterns, such as one produced from an unknown biological evidentiary sample— e.g., a semen specimen retrieved from a rape victim and one from the known blood sample of the suspected rapist — one simply looks to see where the probe "landed” on the two patterns. Because of polymorphisms in the chromosomal loci to which the probe is directed, it is highly unlikely[11] that the probe will find its complementary code on fragments of equal length in the DNA specimens of two people. If the known and unknown biological specimens are from the same person, one can expect to find the probe on fragments of identical length and, consequently, in identical positions on the two patterns.
POSITIONS OF THE PARTIES
No witness challenged the validity of the scientific principles and technology underlying the DNA fingerprinting procedures set forth above, and their general acceptance in the particular scientific field in which they belong — molecular biology, biochemistry and human genetics. And it is abundantly clear that these principles and technology have gained general acceptance in said scientific fields.
The defense attack is aimed elsewhere — at two propositions: (1) That even though the theory underlying DNA fingerprinting is valid and generally accepted in the scientific community, Lifecodes’ laboratory procedures, methodology, and quality controls are not adequate to assure the reliability and accuracy of its results; and (2) that Lifecodes’ population studies are inadequate to establish a claimed power of identity for its results under the laws of population genetics.
With respect to both propositions it may well be that they go, not to the question of admissibility of the scientific test under the Frye test, and of opinions by expert witnesses deduced therefrom, but to the weight of the evidence, a matter for resolution by the trier of facts. However, it may not be necessary to resolve this issue, for substantively the court finds that neither of the two defense propositions is supported by the weight of the evidence presented at this hearing.
*318 In support of the first proposition, the defense called Dr. Neville Colman, an associate professor of pathology at the Mt. Sinai School of Medicine, where he directs the clinical pathology or laboratory medicine training program; Dr. Colman is also the director of the hematology laboratory and blood bank at the Bronx Veterans Administration Medical Center, which also has a research laboratory. His curriculum vitae lists 140 articles and/or abstracts published by him, only 20 of which were published in peer review journals.
Dr. Colman’s area of experience is laboratory medicine, and he was held qualified to testify and render an opinion as an expert only with respect to matters of laboratory procedures, laboratory monitoring, and scientific method. He is neither a molecular biologist nor a population geneticist.
Dr. Colman’s concern was with whether or not the laboratory procedures, methodology, and quality control used by Lifecodes were adequate to assure the accuracy and reliability of its testing results. He thought not! However, on every point raised by him he was overwhelmingly refuted — both by the facts and by the opinion of experts with superior qualifications and experience.
Lifecodes’ laboratory protocol (manual) for DNA fingerprinting was produced and proved quite extensive. It was reviewed by two experts called by the prosecution — Dr. Richard J. Roberts and Dr. Kenneth K. Kidd.
Dr. Roberts is the assistant director for research at the Cold Spring Harbor Laboratory on Long Island, New York, and as such is the deputy to the director of said laboratory. The director of the laboratory is one James Watson — the very same James Watson who in 1953, together with Francis Crick, after much study and experimentation on their part and on the part of many other scientists, discovered the double helix structure of DNA, revolutionizing the field of molecular biology and genetics, and for which they received a Nobel Prize.
Dr. Roberts is a molecular biologist and one of the world’s leading experts in the field of restriction enzymes, 75% of which were discovered at the Cold Spring Harbor Laboratory. Restriction enzymes, used as "molecular scissors”, lie at "the very heart of probably half of molecular biology” according to Dr. Roberts. Many of the techniques used in the field of recombinant DNA (rDNA) and genetic engineering, including much of the technology and basic apparatus used in gel electrophoresis, were developed at Cold Spring Harbor Laboratory.
*319 Dr. Roberts has published 98 articles in peer review journals, all of which dealing with DNA and/or molecular biology.
Dr. Roberts testified that all of the principles and technology underlying DNA fingerprinting and Lifecodes’ Print Identification test were valid and generally accepted by the scientific community in the fields of molecular biology and genetics.
Dr. Roberts reviewed not only Lifecodes’ laboratory protocol, but an article entitled Allele Frequency Distribution of Two Highly Polymorphic DNA Sequences in Three Ethnic Groups and Its Application to the Determination of Paternity, by Dr. Michael Baird (a scientist with Lifecodes from its inception, and currently director of paternity and forensic evaluation at Lifecodes, and one of the People’s witnesses in this hearing), et al., published in 1986 in the American Journal of Human Genetics (Am J Hum Genet, 39:489-501 [1986]), a peer review journal, and dealing with the allele frequency of two loci,[12] using probes previously used by Lifecodes.
With respect to Lifecodes’ laboratory protocols, he found same eminently satisfactory and similar to the protocols used at Cold Spring Harbor Laboratory and published by the Cold Spring Harbor Laboratory in a book entitled the Maniatis/ Sanbrook Manual of Cloning Procedures. He specifically commented favorably on Lifecodes’ practice of always including in its gel electrophoresis process a known set of markers as a control to assure the quality of the gel and the validity of the process.
Dr. Roberts testified that Lifecodes’ laboratory protocols contained the same quality controls for all its procedures that he would have established if he had been setting up Lifecodes, and that all the principles and procedures being used by Lifecodes in its DNA fingerprinting were procedures and principles generally recognized by the scientific community as being accurate, reliable and appropriate. Indeed, he testified that DNA fingerprinting entailed no new scientific principles, only scientific principles that had long been established in and accepted by the scientific community. In other words, that DNA fingerprinting was merely the commercialization of long-established scientific principles.
A matter of extremé significance testified to by Dr. Roberts, and confirmed by Dr. Baird and Dr. Kidd, and Dr. Nierzwicki *320 Bauer (infra), and unrefuted by the defense experts, is that it is impossible under the scientific principles, technology and procedures of DNA fingerprinting (outside of an identical twin), to get a "false positive” — i.e., to identify the wrong individual as the contributor of the DNA being tested. If there were insufficient DNA for the test, or if the test, or any of its steps, were performed improperly, no result at all would be registered — in other words, the autoradiograph would be blank. Thus the dichotomy can never be between an accurate answer and a false answer, but only between an accurate answer and "no answer.” Under the undisputed testimony received at the hearing, no "wrong” person, within the established powers of identity for the test, can be identified by the DNA fingerprinting test.
With respect to the journal article heretofore referred to as People’s exhibit 10, dealing with Lifecodes’ methodology for establishing the power of identity for its DNA fingerprinting test results, Dr. Roberts expressed his concurrence in the reliability of the methodology used and the results obtained. He asserted that if the probes involved in People’s exhibit 10 were used to establish identification, the results would be reliable.[13]
People’s exhibit 17 is an article coauthored by Dr. Michael Baird and others associated with Lifecodes, entitled Human Population Genetic Studies of Five Hypervariable DNA Loci. It describes and sets forth the results of a two-year study conducted by Lifecodes, using the methodology established in People’s exhibit 10, for the purpose of defining and establishing the validity of the four probes used by Lifecodes in its DNA print identification test and the power of identity of the test results using these four probes.[14] It is from this population genetics study that Lifecodes derives its claimed mean power of identity for its identification tests of 1 in 1.4 billion for American Blacks and 1 in 840 million for American Whites.
This article was submitted by Lifecodes in late April or early May 1988 for publication by the American Journal of *321 Human Genetics. It has not yet been accepted for publication so it has not yet gone through the normal peer review process.
However, the article was in fact peer reviewed by Dr. Roberts at the behest of the People (and, more importantly, by Dr. Kenneth K. Kidd, infra, a renowned population geneticist as well as a molecular biologist). Roberts testified that even though the implications of the results of People’s exhibit 17 are in the field of human population genetics, it simply dealt with the frequency of allele distribution, a subject for standard, straight forward scientific tests, and thus not within the sole province of the field of population genetics. Roberts asserted that he was an editor of a journal (Nucleic Acids Research) that accepts studies as contained in People’s exhibit 17 and as such was qualified to comment upon its reliability and suitability for publication. In his opinion the methodology utilized for the tests contained in People’s exhibit 17 was accepted by the scientific community and the tests were done properly. Not being a population geneticist he did not comment upon those aspects. He asserted further that no new scientific principles were involved in People’s exhibit 17.
Dr. Kenneth K. Kidd, a witness for the People, is currently a professor of human genetics, psychiatry, and biology at the Yale University School of Medicine. He is the author or coauthor of 184 articles appearing mostly in peer review journals, many of which articles are in the field of molecular biology and population genetics. He is chairman of the DNA Committee for the next scheduled meeting of the Human Gene Mapping Conference. For the purpose of this hearing he qualified as an expert in the fields of both molecular biology and population genetics.
With respect to each and every step in the DNA fingerprinting test, he testified, just as did Dr. Roberts, that the principles, applicable procedures, and technology involved were deemed reliable by the scientific community and had gained general acceptance therein in the particular field to which the principle, procedure and technology belonged.
He not only had reviewed Lifecodes’ written laboratory protocols, but had in fact visited its laboratory and observed a portion of each step in the DNA fingerprinting process. In his opinion, the protocols were not only acceptable by the scientific community, and deemed reliable therein, but were among the most detailed and specific laboratory protocols for the procedures involved that he had ever seen. Not only had he no *322 criticism of Lifecodes’ laboratory from his personal inspection thereof, but he was extremely impressed with what he saw, with the care that was taken to estimate allele frequencies with precision, to estimate fragment sizes on gels with a very high precision, and to include a variety of controls in every step of the procedures to avoid possibility of error.
At the request of the People, Dr. Kidd had reviewed both People’s exhibit 10 and People’s exhibit 17. He testified he read these articles with the same critical attitude that he would have used if these articles had been given to him by the editor of a journal for peer review. In his opinion the information contained in both articles was completely reliable and correct. He contradicted Dr. Colman’s thesis that the scientific community always required that a study be validated by replication before that study could be accepted; the type of population study involved in People’s exhibit 17 did not lend itself to replication and replication would not be required by the scientific community before acceptance. He further contradicted Dr. Colman’s assertion that probes used in molecular biology must be subjected to the peer review process utilized prior to publication in a peer review journal. Dr. Kidd totally refuted this thesis, setting forth that probes are validated as they are disseminated through and used by the scientific community.
As used in molecular biology, "probes” and "loci” are functionally synonomous. A probe is a segment of recombinant DNA that is engineered to go to a particular, predetermined locus on a particular chromosome (the location of the particular gene, allele, or polymorphic DNA segment being used).
The Human Gene Mapping Conference is a prestigious international organization of scientists that has adopted the responsibility of mapping the human genome. It meets every two years for the purpose of registering newly discovered gene (allele) loci and probes and assigning names or numerical designations to them. Listing with the Human Gene Mapping Conference of a locus or a probe is equivalent to general acceptance thereof by the scientific community.
Dr. Kidd, who has been extremely active in the Human Gene Mapping Conference, serving on many of its committees, chairman of the DNA Committee for the next conference, and the scientist in charge of supervising the assignment of locus *323 designation numbers,[15] testified that all probes used by Life-codes in its DNA fingerprinting (i.e., all probes studied in People’s exhibit 17) have been accepted, mapped and published by the Human Gene Mapping Conference.
Dr. Michael L. Baird was called as a witness by the People. He was one of the original scientific employees of Lifecodes, which began in 1982 as a research and development biotechnology laboratory, initially doing paternity testing. It was bought out by Quantum Chemical Company in which Dr. Baird is neither a stockholder nor the holder of any stock options. Dr. Baird is currently director of paternity and forensic evaluation for Lifecodes. His field of expertise is in both molecular biology and population genetics. He is the author or coauthor of 25 articles and 25 abstracts dealing primarily with molecular biology and various phases of genetics, including population genetics.
In his position with Lifecodes, Dr. Baird is responsible for standards and quality control. In answer to Dr. Colman’s complaint that there were no standards for quality controls to assure the accuracy of a DNA fingerprint test, Dr. Baird testified that he was also a member of the DNA Subcommittee of the Parentage Testing Committee of the American Association of Blood Banks (AABB). As such, there was received into the evidence of this hearing certain proposed standards for tests involving DNA polymorphisms which were approved by Dr. Baird’s Subcommittee and thereafter by the full Parentage Committee on May 23, 1988, with the recommendation that these standards be adopted by the full board of directors of the AABB when it meets on July 28, 1988.[16] These stan *324 dards are all-encompassing and meet every objection made by Dr. Colman, and more. Dr. Baird testified that he was one of the chief formulators and proponents of these guidelines and that they are currently fully adhered to by Lifecodes even prior to their anticipated adoption by the full Board of the American Association of Blood Banks.
Received into evidence also were exhibits showing that Lifecodes’ quality control program analyzes the quality of the DNA isolated from a piece of submitted evidence to make sure the DNA is of appropriate quality to do the test; another part of the quality control program looks at the enzyme digestion to assure that correct digestion or fragmentation has taken place; the quality control program includes controls for the DNA fragment separation, the DNA probe, and even the data analysis; other quality control programs are in place to monitor equipment maintenance throughout the test, and reagent preparation. Additional credibility is derived from the use in every test of a control DNA that is processed at the same time as the unknown DNA. The pattern obtained from the control DNA has been seen many times before; thus one knows that the test on the unknown DNA has worked correctly because the pattern seen with respect to the control DNA is what is to be expected.
Lifecodes has initiated a program of proficiency testing or external blind trials. The first series of external blind trials was done with samples of bloodstains received from the San *325 Bernardino Sheriffs office in California; the second series was done with both blood and semen stains obtained from the Orange County Sheriffs office, again in California. Every case announced by Lifecodes as a match was correct; in no case was an erroneous match made. Every other case was announced "no result” because insufficient DNA had been isolated.
Dr. Baird testified that experimentation has shown that environmental effects, such as heat, humidity, and ultraviolet light, do not appear to have an adverse effect on the integrity of DNA and a DNA print test. Nor does the substrate — the surface upon which the biological evidence is found (as for example, a carpet) — have an adverse effect upon the DNA molecule. As far as the age of the biological evidence is concerned, successful DNA print tests have been done on blood and semen stains three years old.[17]
Again, most importantly, reiterating the testimony of Dr. Roberts and Dr. Kidd, Dr. Baird asserted that the DNA print test is incapable of giving a wrong answer — i.e., announcing a false match or false positive. It may not give an answer at all if the DNA has been degraded for any reason or there is not enough DNA present. But neither the testing procedure itself, nor any known environmental factor, nor anything else, can alter the DNA to give a false result. Again, the dichotomy is only between a correct answer or "no result” — never a false positive. And this view appears to have gained general acceptance in the scientific community.
With respect to probes, Dr. Baird testified that all probes used by Lifecodes are known in the scientific community and available for use by anyone therein. No adverse comments have ever been received. He stated that all these probes have been evaluated by independent scientists and, indeed, several of the probes being used by Lifecodes in its identification tests were developed by other scientists outside of Lifecodes. As did Dr. Kidd, Dr. Baird affirmed that all probes being used by Lifecodes were accepted and published by the Human Gene Mapping Conference.
Also called as a witness by the People was Dr. Sandra Nierzwicki-Bauer, an assistant professor of biology at Rensselaer Polytechnic Institute. She is the author of 23 articles in the field of molecular biology.
*326 Dr. Nierzwicki-Bauer testified that for the past 2Vi years at RPI she has been conducting experiments similar to DNA fingerprinting upon cyanobacterium, commonly known as blue-green algae.
The techniques and procedures being used are the same as in DNA fingerprinting, or "restriction fragment length polymorphisms”, as these techniques are scientifically known. She testified that whatever its source, DNA is always the same basic chemical, although much less DNA is present within blue-green algae, than in humans, and the packaging is different.
Dr. Nierzwicki-Bauer stated that she was familiar with Dr. Baird’s testimony and with DNA fingerprinting as done by Lifecodes, and that in her opinion, with reasonable scientific certainty, the principles, technology, and procedures utilized by Lifecodes in its DNA Print Identification test are accepted as reliable by the scientific community and the scientific literature, including peer review journals. With respect to the latter, one of her articles,[18] published in 1986 in EMBO Journal, concerned identification of blue-green algae using restriction fragment length polymorphisms, the same procedures as used in Lifecodes DNA Print Identification test. No negative response or criticism was ever received from the scientific community respecting this article, the techniques used or the conclusions reached. She further agreed with Dr. Baird that environmental factors would have no effect upon a DNA sample, and concurred with his opinion that if for any reason the DNA sample became degraded, you would be able to detect that before you actually carried out the test, and if you did go ahead and carry out the test, you would get no result rather than a false positive result.
Respecting peer review, Dr. Colman agreed that the 1985 articles[19] by Dr. Alec J. Jeffreys, a renowned British scientist, and proponent of DNA fingerprinting, appearing in Nature, a prestigious British peer review journal, expounded the restriction fragment length polymorphism procedures that underlie the DNA fingerprint techniques used by Dr. Jeffreys in Eng *327 land and Lifecodes in the United States. He agreed further that since 1985 and the publication of these articles, no peer review articles ever appeared refuting Dr. Jeffreys’ articles. Indeed, through Dr. Jeffreys, DNA fingerprinting is being more and more used in criminal detection work in England.
POPULATION GENETICS — THE POWER OF IDENTITY
People’s exhibit 17 represents the results of a two-year study by Lifecodes to determine the combined power of identity of the probes utilized in its DNA Print Identification test.
DNA from approximately 900 unrelated individuals, subdivided into three ethnic groups (American Blacks, Caucasoids, and Hispanics), was obtained and successively hybridized to each DNA probe. The allele (gene) frequency distribution was determined for each group for each locus. Utilizing the mathematics of chance and probability, with respect to the ethnic groups of American Blacks and Caucasoids, separately, the individual power of identity (allele frequency) for each of the four loci or probes currently used by Lifecodes in its DNA Print Identification test were multiplied to arrive at a mean combined power of identity for the four probes for American Blacks of 1 in 1.4 billion and Caucasoids (American Whites) of 1 in 840 million.
The validity of this multiplication procedure (as do all probability calculations) presupposes that each fact observed, and entering into the calculation, is random and independent of the others.
In population genetics, this multiplication procedure for determining the combined power of identity for a series of individual powers of identity is valid only if two conditions substantially exist, or adjustments are made for deviations from these conditions. These conditions are known as "Hardy-Weinberg equilibrium” and "linkage equilibrium.” These conditions assure that pure chance will govern observed gene frequencies, not other factors, so that the laws of probability will be attained.
The name, "Hardy-Weinberg”, applied to the first of these principles, derives from G. H. Hardy and W. Weinberg, who in 1908 independently formulated a theorem that became the foundation of population genetics. According to the Hardy-Weinberg principle, gene frequencies, will remain constant from generation to generation within a population unless *328 outside forces act to change it, so long as mating remains random.[20]
The Hardy-Weinberg law itself is an algebraic equation that describes the genetic equilibrium[21] within a population. Standard statistical techniques can tell us what gene frequencies ought to be expected when a population is in Hardy-Weinberg equilibrium. When the observed gene frequencies of a population deviate from the gene frequencies to be expected when that population is in Hardy-Weinberg equilibrium, then Hardy-Weinberg equilibrium is said not to have been attained. This is an indication that nonchance forces are at work, impairing the laws of probability. However, again by standard statistical techniques we can measure the deviation of our observed gene frequencies from Hardy-Weinberg equilibrium. If the deviation were slight, we would deem it insignificant. Or we could make statistically recognized adjustments to our gene frequency observations.[22]
With respect to the concept of "linkage equilibrium”, the term "linkage” means the association of genes on the same chromosome. Genes that occupy loci which are close together will tend to be transmitted together. This introduces an element other than chance and makes a determination of the power of identity from the observed frequency of such genes difficult.[23]
*329 Linkage "disequilibrium” is somewhat of a misnomer because there can be a degree of disequilibrium even if the genes are located on different chromosomes.[24]
Dr. Richard Borowsky was called as a witness by the defense. He is an associate professor of biology at New York University. His area of expertise is population genetics, primarily respecting fish and crustaceans. He has published approximately 20 articles in peer review journals, and 6 abstracts, in the area of population genetics.
His chief complaint with People’s exhibit 17 is not that Hardy-Weinberg equilibrium was or was not obtained. His complaint was that People’s exhibit 17 did not contain within itself the raw data necessary to make that determination. He conceded that Lifecodes might have other information or data upon which the existence or absence of Hardy-Weinberg equilibrium could be determined. But he objected that this data was not included in the article itself.
Dr. Kenneth Kidd, an eminent population geneticist, and conceded by Dr. Borowsky to be an expert in the field of population genetics, testified that in an article such as People’s exhibit 17, it was not necessary nor common to include within the article the raw data upon which its results are predicated. So long as this raw data was available for examination, the editor of the journal in which publication was sought would probably eliminate the raw data in order to conserve journal space.
Strangely, Dr. Borowsky first requested the raw data underlying People’s exhibit 17, then withdrew the request. He conceded that there were ways to measure from the raw data, or data derived therefrom, the existence or nonexistence of Hardy-Weinberg equilibrium or the departure therefrom. He thought, however, the sample size used by Lifecodes too small to determine the issues of Hardy-Weinberg equilibrium. Dr. Borowsky seemed obsessed with the thought that Lifecodes intended to mix its separate ethnic population results into a combined statistic, which, because of the wide variations in *330 gene frequencies between the ethnic groups examined, would have destroyed the integrity of the statistics and greatly disrupt Hardy-Weinberg equilibrium. But there is absolutely no support for his fear. There is no reason for Lifecodes to combine its statistics for the separate ethnic groups studied; it has denied any intent to do this and, indeed, its forensic reports do not do this, but maintain the separate figures for each ethnic group category.
Dr. Kidd testified that in his opinion, and that of the scientific community in general, the sample size used by Lifecodes in People’s exhibit 17 was moderately large for such experiments in human genetics.
He further testified that he was provided by Lifecodes with matrices of observed and expected genotypes from the data base out of which the gene frequencies set forth in People’s exhibit 17 were derived. Dr. Borowsky conceded that the methodology used in the matrices was the correct methodology for determining questions concerning Hardy-Weinberg. Using the matrices, Dr. Kidd found no marked deviation from the expected and stated that the data appeared to meet all of the assumptions required for Hardy-Weinberg equilibrium. He found the procedures used by Lifecodes for making probability estimates perfectly valid, leading to perfectly respected and accurate estimates.
He stated, however, that since there were individual genotypes that were observed to occur slightly more frequently than expected, and others observed to occur slightly less frequently than expected, one might wish to make an adjustment in the claimed mean power of identity reported in People’s exhibit 17. He thought the adjustment warranted would be much less than a factor of 10. A factor of 10 would be the most outside and conservative adjustment that could be made. This would reduce the mean power of identity for American Blacks from 1 in 1.4 billion to 1 in 140 million, and for Caucasoids (American Whites) from 1 in 840 million to 1 in 84 million.
With respect to linkage equilibrium or disequilibrium, Dr. Kidd stated that within a human population, the fact that two loci are on different chromosomes, and thus unlinked, is very strong prima facie evidence that there is no significant linkage disequilibrium. It is possible, but a rare phenomenon, for unlinked loci to show linkage disequilibrium when one restricts one’s sample primarily to a single ethnic group, and *331 would be of only small numeric magnitude if it occurred. But, regardless of all this, an examination of the data given by Lifecodes indicated that there was, in fact, no linkage disequilibrium with respect to the experiments conducted in People’s exhibit 17.
Dr. Kidd also testified that the data given him by Lifecodes disproved the existence of null alleles as suggested by Dr. Borowsky and the court finds this a nonissue.
OTHER ISSUES
CPL 240.40 (2) (b) (v) permits a court in which an indictment is pending, upon motion of the prosecutor, subject to constitutional limitation, to order a defendant to ”[p]ermit the taking of samples of blood, hair or other materials from his body in a manner not involving an unreasonable intrusion thereof or a risk of serious physical injury”.
In Matter of Abe A. (56 NY2d 288, 291) the Court of Appeals set down the following guidelines: The People must establish "(1) probable cause to believe the suspect has committed the crime, (2) a 'clear indication’ that relevant material evidence will be found, and (3) the method used to secure it is safe and reliable. In addition, the issuing court must weigh the seriousness of the crime, the importance of the evidence to the investigation and the unavailability of less intrusive means of obtaining it, on the one hand, against concern for the suspect’s constitutional right to be free from bodily intrusion on the other.”
In each case herein these requirements have been met. In People v Wesley the defendant has been indicted for burglary in the second degree; the People further seek evidence that the defendant raped and murdered the victim, a mentally retarded woman. DNA from the victim has already been positively matched with DNA retrieved from bloodstains on the defendant’s clothing; the People seek to test DNA from the defendant’s blood to show that the blood on his clothing is not that of the defendant. This would logically complete the evidentiary picture and avoid trial smokescreens.
In People v Bailey the defendant has been indicted for rape in the first degree. The victim has identified him as the perpetrator of the crime, which the defendant denied. Blood is sought from defendant Bailey to compare the DNA therein with DNA from tissue samples of a fetus aborted by the victim. There is a defense claim that the victim was promiscu *332 ous and that the aborted fetus derived from intercourse between the victim and another person.
The extraction of the blood will be carried out in a medically safe way and will not be unduly intrusive. In each case DNA fingerprinting is expected to produce the most important evidence respecting the defendant’s guilt or innocence.
CONCLUSION
DNA fingerprinting — its underlying principles, procedures and technology — is a scientific test that is reliable and has gained general acceptance in the scientific community and in the particular fields thereof in which it belongs — to wit, molecular biology, population genetics and diverse other branches of genetics, chemistry, biology, and biochemistry.[25]
Although Lifecodes claims a mean power of identity for its DNA print identification test, using the four probes described herein, of 1 in 1.4 billion for American Blacks and 1 in 840,000,000 for Caucasoids (American Whites), the evidence at this hearing, and due process, require that in these two trials the People be permitted to assert a power of identity limited to a mean power of 1 in 140 million for American Blacks and 1 in 84 million for Caucasoids (American Whites).[26]
Motion in each case to permit the People to take samples of blood, hair, and/or other materials from the body of each respective defendant, susceptible of providing DNA, is granted. The desired biological specimen shall be taken in a medically safe way by a medically approved procedure, and in a manner not involving an unreasonable intrusion of the respective defendant’s body or a risk of serious physical injury thereto.

. Deoxyribonucleic acid.

. At the hearing the test is also referred to as "DNA Print Identification”, a trademark name possessed by Lifecodes Corporation, the commercial laboratory proposed by the People to do the desired testing. Other commercial laboratories that offer DNA fingerprinting testing in the United States are Cellmark Corporation and Cetus Corporation.
In molecular biology the techniques used in the DNA fingerprinting test process are known under the heading of "restriction fragment length polymorphism”, abbreviated as RFLP. Under RFLP technology, DNA can be extracted, fragmented and analyzed at the molecular level, then compared with DNA from a known biological specimen for identification purposes.

. In the case of Cameron Bailey what is sought is DNA paternity testing, which involves the same techniques.

. The largest exception are red blood cells, which cells are nonnucleated. This is not significant herein for blood is comprised of many other cells and components, including white blood cells, that can contribute DNA when forensically it is necessary to use blood for comparison purposes.

. An insignificant exception and meaningless with respect to the efficacy of DNA fingerprinting are certain antibodies produced by the immune system.

. Sources: Encyclopedia Britannica (15th ed 1987); The World Book Encylopedia (1988 ed); Rothwell, Human Genetics (Prentice-Hall 1977); Moenssens, Inbau, Starrs, Scientific Evidence In Criminal Cases (3d ed Foundation Press 1986).

. The basis for the statement that the DNA of no two people, outside of identical twins, is precisely the same, derives, according to the testimony of Dr. Richard Roberts, from the laws and principles of Mendelian inheritance and from empirical studies; the statement and underlying principles are generally accepted by the scientific community.

. Commonly agarose gel, a jello-like substance derived from kelp. The admissibility of electrophoresis has been approved by the Appellate Division, Second Department, in People v Crosby (116 AD2d 731 [1986]).

. In genetic engineering, a probe is a fragment of DNA carrying the complementary code for a specific base sequence. Probes can be used to detect defective genes that cause disease and to detect variations in base sequence that establish genetic identity.

. Recombinant DNA technology is the incorporation of all or part of the DNA from one organism into the DNA of another organism.

. How unlikely — i.e., the power or certainty of identity — is determined by empirical studies which will be discussed later in this opinion.

. D14S1 and HRAS-1. This article was received into evidence, and frequently referred to throughout the hearing as People’s exhibit 10.

. The methodology used in People’s exhibit 10 for the establishment of the power of identity of the results of an identification test is equally applicable to paternity testing and forensic testing.

. These probes are D2S44, D14S1, D17S79, and DXYS14. In an individual case, the power of identity could be greater than that stated in the text, or could be less, depending upon which particular polymorphic fragments are present in such case. Hence, the "1 in 1.4 billion” and "1 in 840 million” are offered as a mean, or average, calculation.

. Indeed, the "Yale Gene Library” is an official recordation place for loci and probes accepted by the Human Gene Mapping Conference.

. Approved for the Parentage Testing Committee at the AABB, May 23, 1988:
AABB PARENTAGE TESTING COMMITTEE STANDARDS FOR TESTS INVOLVING DNA POLYMORPHISMS
I. DNA loci used in parentage testing shall meet the following criteria prior to reporting results.
A. DNA loci shall be validated by family studies to demonstrate that the loci exhibit Mendelian inheritance and low frequency of mutation and/or recombination, less than .002 (2 per 1,000).
B. The chromosomal location of the polymorphic loci used for parentage testing shall be recorded in the Yale Gene Library or by the International Human Gene Mapping Workshop.
C. Polymorphic loci shall be documented in the literature stating the restriction endonuclease and probes used to detect the polymorphism, the conditions of hybridization and size(s) of variable and constant fragments.
*324 D. The type of polymorphism detected shall be known (i.e., single locus, multilocus, simple diallelic, or hypervariable).
II. A method shall be available to assure complete endonuclease digestion of DNA for testing.
III. Size markers with discrete fragments of known size shall span and flank the entire range of the DNA loci being tested.
IV. A human DNA control of known size shall be used on each electrophoretic run.
V. Autoradiographs or membranes shall be read independently by two or more individuals.
VI. DNA reports shall contain at the minimum:
A. Name of the DNA locus tested as defined by the Nomenclature Committee of the International Human Gene Mapping Workshop.
B. Probe used to detect the polymorphism.
C. Restriction endonuclease used to cut the DNA.
D. Reported allelic fragments shall be listed by size or allelic description (alpha numeric).
VII. Confirmatory testing by an independent laboratory shall be possible for all DNA loci. These laboratories shall meet AABB standards for parentage testing using DNA probes.

. Indeed, DNA has been extracted from an Egyptian mummy, although not of a sufficiently high molecular weight to enable the performance of a DNA print test.

. Differences in mRNA levels in Anabaena living freely or in symbiotic association with Azolla, EMBO J, 5:29-35.

. Jeffreys, Wilson & Thein, Individual-specific "fingerprints” of human DNA, Nature, accepted May 3, 1985.
Jeffreys, Gill & Werrett, Forensic application of DNA "fingerprints”, Nature, accepted Oct. 24, 1985.

. The forces of evolution (mutation, natural selection, and drift) operate in nature and disturb the Hardy-Weinberg equilibrium so that, in reality, genes and gene frequencies do tend to change in populations.

. Equilibrium is a condition that exists when you find gene frequency to be what you would expect by chance alone, if everything were independent and unrelated.

. By analogy, on every toss of a coin there is theoretically a 50% chance of a head and a 50% chance of a tail. If one tosses the coin 100 times, it would be expected that heads would come up 50 times and tails 50 times. However, if heads came up 100 times, we would expect that the toss of the coin is being governed by forces other than random chance. If the ratio were, for example, 54 heads to 46 tails, we might deem that an insignificant deviation.

. The following analogy may shed light: Assume a population of 10 automobiles, 5 being convertibles and 5 not. The automobiles are numbered but not seen. The probability of selecting a convertible is 1 out of 2.
Assume that five of the automobiles are colored blue. The probability of selecting a blue automobile is 1 out of 2, and the probability of selecting a blue convertible is 1 out of 4.
Assume now that only convertibles are colored blue. The probability of selecting a blue convertible reverts back to 1 out of 2.
Thus, if, for example, four genes were always transmitted together, if *329 these genes were used in an identification test the power of identity achieved would not be a multiple of the four frequencies, but merely the power of identity of one of them.

. Dr. Baird testified that each of the four probes used by Lifecodes in its DNA fingerprinting was located on a different chromosome from the others. This by itself significantly reduces the problem entailed in "linkage disequilibrium” because where the genes are located on separate chromosomes there is less of a tendency to be transmitted together.

. DNA paternity testing utilizes the same principles, procedures and technology as DNA fingerprinting and is a scientific test that is reliable and has gained general acceptance in the same scientific community.

. This is derived from reducing the over-all claimed mean power of identity for the probes used by Lifecodes herein by a factor of 10, in order to eliminate any possible Hardy-Weinberg disequilibrium. With respect to each specific test the specific power of identity found and reported shall accordingly be reduced by a factor of 10 before admission into evidence. (See, n 14.)