[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: MOTION TO STRIKE
This is a paternity action brought by the plaintiff, Shannon Lach, against the defendant, Richard J. Welch, as the administrator of the estate of Michael R. Welch. On November 12, 1990, the plaintiff gave birth to a child, Kaitlyn Elizabeth Ruddy. The plaintiff alleges that Kaitlyn, who was born out of wedlock, was fathered by Michael Welch, a previous boyfriend of the plaintiff. On June 1, 1991, Michael Welch died in an automobile accident. On October 21, 1993, the plaintiff filed the present petition to establish the paternity of Kaitlyn. The plaintiff asks the court to find that Michael Welch was Kaitlyn's father and to order his estate to stand charged with the support and maintenance of the child. The plaintiff has also filed motions, pursuant to General Statutes § 46b-168 (a) and § 46b-168 (b) for a blood group analysis and genetic tests to determine whether Michael Welch was Kaitlyn's father and to order his estate to stand charged with the support and maintenance of the child.
The plaintiff has also filed motions, pursuant to General Statutes §§ 46b-168(a) and 46b-168(b) for a blood group analysis and genetic tests to determine whether Michael Welch was Kaitlyn's father.
The plaintiff's motions do not specify which individuals they want to test. However, at oral argument, the plaintiff proposed the comparison of the "DNA prints" of Michael Welch's relatives with the prints of Kaitlyn and the plaintiff for purposes of determining whether Michael Welch was Kaitlyn's father.
Defendant Richard Welch, as the administrator of Michael Welch's estate, has filed a motion to strike the plaintiff's paternity action on the ground that a paternity action must be determined during the lifetime CT Page 6567 of the putative father and does not survive his death. In his motion, the defendant has failed to distinctly specify his claims of insufficiency as is required by Practice Book § 154. The court, however, will consider the merits of the motion. See Rowe v. Godou, 12 Conn. App. 538,541-42, 532 A.2d 978 (1987). Each party has filed a memorandum of law in support of their respective positions.[1]
A motion to strike challenges the legal sufficiency of a pleading. Practice Book § 152; Ferryman v. Groton,212 Conn. 138, 142, 561 A.2d 432 (1989). In deciding on a motion to strike, the court must "construe the complaint in the manner most favorable to sustaining its legal sufficiency." Michaud v. Warwick, 209 Conn. 407,408, 551 A.2d 738 (1988). The court is limited to the facts alleged in the challenged pleading; King v. Boardof Education of Watertown, 195 Conn. 90, 93,486 A.2d 1111 (1985); and must admit the truth of all facts well pleaded. Mingachos v. CBS Inc., 196 Conn. 91, 108,491 A.2d 368 (1985). "The sole inquiry at this stage is whether the plaintiff's allegations, if proved, state a cause of action." Levine v. Bess and Paul Sigel HebrewAcademy of Greater Hartford, Inc., 39 Conn. Sup. 129,132, 471 A.2d 679 (1983).
At common law there was no remedy to compel a putative father to contribute to the support of his illegitimate offspring. Moore v. McNamara, 201 Conn. 16,24, 513 A.2d 660 (1986). An illegitimate child who had not been legitimized was filius nullius (the child of no one) and incapable of inheriting from anyone. See Trimblev. Gordon, 430 U.S. 762, 768, 97 S.Ct. 1459, 1464,52 L.Ed.2d 31 (1977). An exception to this rule was recognized in the State of Connecticut. Heath v. White,5 Conn. 228 (1824); See Alexander v. Alexander, 42 Ohio Misc.2d 30,537 N.E.2d 1310, 1312 (1988). In the "progressive" case of Heath, our Supreme Court held that an illegitimate child may inherit from his mother, reasoning that the English law of descents had never been admitted in Connecticut. The court stated, "[n]othing can be more unjust, than that the innocent offspring should be punished for the crimes of their parents, by being deprived of their right of inheriting by the mother, when there doth not exists among men a relation so near and CT Page 6568 certain as that of mother and child." Id., 234.
Accordingly, "[i]t is the long established policy of this state to require a father to support his illegitimate child." Kuser v. Orkis, 169 Conn. 66, 71, 362 A.2d 943
(1975).
"Under Connecticut law all minor children, whether born in wedlock or out of wedlock, are owed a legal duty of support by their parents. This duty of support is enforceable throughout the child's minority." Moore v.McNamara, 40 Conn. Sup. 6, 8, 478 A.2d 638 (1984, Jackaway, J.), affirmed, supra. When a parent dies, children born out of wedlock, such as Kaitlyn, are entitled to share in their father's estate in any of three situations: (1) when the father has been adjudicated as such by a court of competent jurisdiction; (2) when there has been an acknowledgement of paternity under oath; or (3) when paternity is established by the Probate Court. General Statutes § 45a-438. It is undisputed that Michael Welch never acknowledged paternity of Kaitlyn under oath and that paternity has not been established by the Probate Court. Accordingly, the sole question before the court is whether a paternity action may be brought pursuant to General Statutes § 46b-160
after the death of the putative father.[2]
In Hayes v. Smith, 194 Conn. 52, 480 A.2d 425
(1984), our Supreme Court addressed a factually similar situation and answered this query in the negative. In that case, the plaintiff instituted a paternity proceeding pursuant to General Statutes § 46b-160 against the estate of the putative father who died prior to the birth of his alleged child. The trial court dismissed the action holding that General Statutes § 46b-160 requires that an adjudication of paternity be made during the lifetime of the putative father. Id., 54.
In affirming the decision of the trial court, theHayes court looked to selected portions of General Statutes § 46b-160 and concluded that the legislature intended that the putative father be alive in order to bring an action for paternity. Id., 60. Specifically, the court cited to that part of the statute which mandates that the mother shall file the paternity petition in the CT Page 6569 Superior Court ". . . . in which either she or the putative father resides . . ." and mandates that the putative father be summoned "to appear to answer the petition. (Emphasis in original.) Id., 59. The court also derived this legislative intent by looking to subsequent statutes in the "Paternity Matters" chapter which repeatedly refer the putative father in the present tense. Id., 59-60.
The plaintiff in Hayes argued, inter alia, that her paternity action should survive even though it was not instituted during the lifetime of the putative father according to the survival statute, General Statutes § 52-599. That statute, in pertinent part, provides:
 (a) A cause of action shall not be lost or destroyed by the death of any person, but shall survive in favor of or against the executor or administrator of the deceased person . . . . (c) the provisions of this section shall not apply (1) to any cause or right of action or proceeding the purpose or object to which is defeated or rendered useless by the death of any party thereto, (2) to any civil action or proceeding whose prosecution or defense depends upon the continued existence of the persons who are plaintiffs or defendants, or (3) to any civil action upon a penal statute.
(Emphasis added.) General Statutes § 52-599.
The court rejected this argument and reasoned that paternity proceedings fall within the second exception to General Statutes § 52-599. Hayes v. Smith, supra, 63. "The nature of this paternity action or proceeding is one in which, at the very least, the `defense depends upon the continued existence of the . . . . defendants.'" Id. The court went on to state:
 It is also apparent that because of the privacy surrounding the circumstances giving rise to the charge of paternity, the decedent's presence to defend properly is quite necessary. Because the question of paternity is one of fact and not of law; HolubCT Page 6570 v. King, 22 Conn. Sup. 118, 120, 163 A.2d 800
(1960); the decedent's continued availability would be a substantial factor in contributing to the reliability of the factfinding process on this question. See Lalli v. Lalli, [439 U.S. 259, 99 S.Ct. 518, 58 L.Ed 508 (1978)].
Id., 64.
The Hayes court included an "in-depth discussion" of Lalli v. Lalli. In that case, the United States Supreme Court upheld the constitutionality of a New York statute that limited an illegitimate child's right to inherit from her natural father. The court held that an illegitimate child could only inherit by intestacy from her natural father where "`a court of competent jurisdiction has, during the lifetime, of the father, made an order of filiation declaring paternity in a proceeding instituted during the pregnancy of the mother or within two years from the birth of the child.'" (Emphasis added.) Id., 261-62. The Lalli court reasoned that due to peculiar problems of proof in establishing paternity, the state had a right to require a filiation decree as the only acceptable form of proof to establish paternity.Id., 268. The court stated, "[e]ven where an individual claiming to be the illegitimate child of a deceased man makes himself known, the difficulties facing an estate are likely to persist. Because of the particular problems of proof, spurious claims may be difficult to expose."Id., 271.
It is clear that the court in Hayes was preoccupied with a "proof problem" inherent to a paternity action against a putative father who is deceased. That decision was released in 1984. Since that time, there have been remarkable advancements made in the medical field in regard to blood and genetic testing for purposes of establishing paternity. Our legislature has recognized these advancements by twice amending General Statutes § 46b-168 to allow for the newest methods of genetic testing. Accordingly, this court believes that the "proof problem" identified by the court in Hayes has been ameliorated.
In Moore v. McNamara, supra, a 1986 case, our CT Page 6571 Supreme Court admitted the use of the human leukocyte antigen (HLA) test, to establish paternity.[3] The HLA antigens occur in the white blood cells as well as the tissue cells. Although blood cells are the easiest cells to obtain for HLA tests, HLA testing is thought of as tissue typing rather than blood group typing. Id., 28.
When combined with red cell tests, the HLA tests may increase the probability of excluding a wrongly accused father to over 99 percent. (Citation omitted.) Id., 29. The court stated:
 We note that combined blood grouping and testing has attained general acceptance in the scientific community as a means for testing for paternity . . . . The American Medical Association, the American Association of Blood Banking, and the American Association of Histocompatibility have all approved HLA testing to determine paternity . . . . . Moreover, while there is some disagreement among medical commentators as to how inculpatory HLA test results should be presented to the fact finder in paternity cases, nearly all agree that such evidence is reliable and should be admitted in one form or another.
Id., 31.
In Palomba v. Gray, 208 Conn. 21, 543 A.2d 1331
(1988), Justice Shea in a concurring opinion stated:
 The use of these new techniques (HLA tests) has raised to such a high level the ability of the scientific community to identify the father of a child whose paternity is disputed that the resolution of such an important issue should no longer be had without such scientific testimony . . . . [Responsible scientific authorities claim that modern scientific techniques have increased the probability of excluding a mistakenly accused man as a father of a child to levels exceeding 99%.] CT Page 6572
(Original footnote No. 1 in brackets.) Id., 36-37.
In 1989, the Connecticut legislature amended General Statutes § 46b-168 to authorize the court to order genetic tests, including an HLA test, in a paternity action to establish exclusion from paternity or as evidence of paternity. 1989 Public Act 89-360.[6]
In addition to HLA testing, the advent of "DNA fingerprinting" has provided an even more remarkable medical advancement. DNA is a molecule that carries the body's genetic information, and is contained in every living organism in every cell which has a nucleus (over 99% of the cells in the human body.) DNA fingerprinting allows the analyst to create a "print" of a person's genetic pattern as found in DNA extracted from the person's blood or tissue sample. Each person's genetic structure is unique and given the role that DNA plays in heredity, the prints can then be compared to other individuals' prints for purposes of determining whether the parties are related.[7] J.E. Cullins, Jr. Should theLegitimate Child Be Forced to Pay for the Sins of herFather? Sudwischer v. Estate of Hoffpauir, 53 La. L. Rev. 1675, 1719 (May 1993.). In People v. Wesley,533 N.Y.S.2d 643, 140 Misc.2d 306 (1988), the court discussed the revolutionary aspect of DNA fingerprinting in the context of a criminal prosecution. The court stated:
 DNA Fingerprinting is at the "cutting edge" of forensic science . . . . DNA fingerprinting is a genetic and molecular biological process that has its basis in the fact that each individual has an entirely unique genetic "signature" derived in turn from the fact that the overall configuration of the DNA, found in every cell in the human body (and for that matter in every living organism) containing a nucleus-over 99% of the cells of the human body — is different in every individual except in the case of identical twins. This fact is not only generally accepted by the scientific community to which it is related, but is uniformly accepted therein. CT Page 6573
 Related to this fact and fully accepted by the scientific community, is the further factor that in each individual the configuration of DNA contained in one cell is the same for every cell in the body of that individual. Thus, for the purpose of DNA fingerprinting, DNA for comparative purposes can be obtained from blood, semen, hair roots, skin, and indeed from over 99% of the cells of the human body.
 The immediate advantage of DNA fingerprinting . . . . is the claimed certainty of identification . . . . The laboratory the People propose to utilize claims a mean power of certainty of identification for American Whites of 1 in 840,000,000, for American Black, 1 in 1.4 billion . . . .
(Footnotes omitted; citations omitted.) Id., 644.
The use of DNA fingerprinting has also been recognized as extremely effective in proving paternity. William C. Thompson Simon Ford, DNA Acceptance andWeight of the New Genetic Identification Tests, 75 Va. L. Rev. 45, 61 n. 76 (April 1989). Following a Newsweek
account that "DNA prints" yield a "certainty" rather than a "possibility of paternity," the American BarAssociation Journal reported that "[i]n the family law area, it means a woman suing for paternity can establish conclusively whether the respondent is the father." Moss, DNA — The New Fingerprints, A.B.A., May 1, 1988 at 66. When both parents of the child are tested, the possibility of paternity, as expressed in a percentage, will either approach one hundred percent or zero percent. See J.E. Cullins, Jr., supra 1719.
When one parent is unavailable, as in the present case, DNA fingerprinting may also be utilized to effectively establish a "probability" of paternity by testing relatives of the unavailable parent. Id., 1714.[8]
The DNA "print" of a father, mother, or other relative of the deceased putative father can be compared to the DNA prints of the child and the available mother to determine whether the parties are related. Although the process can CT Page 6574 not be deemed conclusive, it has been recognized by the scientific community as quite valuable. PaternityTesting: Blood Group Systems and DNA Analysis by VariableNumber of Tandem Repeat Markers, Journal of Forensic Sciences, Vol. 35, No. 5, Sept 1990, pp 1217-1225. In one abstract, both the alleged father and his first wife were deceased. "DNA prints" from his second wife and her four children were compared with the "DNA print" of the child who was trying to establish paternity. The high probability of paternity (0.9999987) led the scientists conclude that the man probably was the actual father.Id.
Furthermore, at least two courts, including one state Supreme Court has recognized the reliability of testing relatives for purposes of establishing paternity. In Sudwischer v. Estate of Paul Hoffpauir, 589 So.2d 474
(La. 1991), the Supreme Court of Louisiana affirmed an order that the legitimate daughter of a deceased father provide a blood test to determine the paternity of an illegitimate daughter. The court reasoned that the DNA fingerprinting of the legitimate daughter would produce relevant evidence which could establish the probability of a relationship between the deceased legitimate daughter and the illegitimate daughter. Id., 475. The DNA expert testified that the probability of the relationship could be as low as one in five or as high as one in a hundred thousand. Id.
In Tipps v. Metropolitan Life Insurance Company,768 F. Sup. 577 (U.S. Dist. Ct., S.D.Tex., May 14, 1991), thirteen year old Lori Kiser sought to prove that Carl Kiser, then deceased, was her biological father so that she could share in his life insurance proceeds. The court acknowledged that prior to the development of accurate, scientific paternity testing, the presumption of Carl's paternity would easily have been sustained based solely on the testimony and evidence offered by the lay witnesses. Id., 579. However, the court relied on DNA comparison tests of Carl's parents, Carl's legitimate son, and Lori to determine that Carl was not Lori's father. The DNA expert testified that "based on her professional knowledge and experience in the field of genetic testing, the test results were at least 95% and probably 99% conclusive." Id., 578. CT Page 6575
In 1993, the Connecticut legislature again amended General Statutes § 46b-168 to allow the use of DNA tests to establish paternity. Public Acts 1993, 93-329 § 10.[9]
That revised statute, in pertinent part provides:
 (a) In any proceeding in which the question of paternity is at issue the court . . . . on motion of any party, may order genetic tests which shall mean deoxyribonucleic acid tests . . . . to determine whether or not the putative father or husband is the father of the child. The results of such tests shall be admissible in evidence to either establish definite exclusion of the putative father or husband or as evidence that he is the father of the child.
(Emphasis added.) General Statutes § 46b-168.
"Principles of law which serve one generation well may, by reason of changing conditions, disserve a later one." Herald Publishing v. Bill, 142 Conn. 53, 62,111 A.2d 4 (1955). Since our Supreme Court decided Hayes, a court faced with the question of paternity is no longer dependent upon fallible testimony. Through the remarkable advancements in genetic testing, science has virtually eliminated the "proof problem" by developing an effective means to prove the identity of an illegitimate child's father in the absence of the father. Our legislature has recognized these advancements by twice amending General Statutes § 46b-168 to provide for the new methods of genetic testing.
Furthermore, our cultural reality has changed. More and more children are being born out of wedlock. These "innocent offspring", Heath v. White, supra 234, should not suffer the loss of property and the right to be supported by both parents simply because of the demise of the parents, or inaction by a birth mother in enforcing the property interests of her children against a putative father during his lifetime. No other legal representative of the illegitimate child is available, unless the child is a recipient of Aid to Families with Dependent Children (AFDC) and the state intervenes to force the mother to CT Page 6576 name the putative father for support enforcement purposes. General Statutes § 17-234et seq.
In the case of a putative father who has died, the child may well be eligible for support through Social Security rather than AFDC. Moreover, having the knowledge of one's own parentage, and adequate support therefrom, is key to the child's self-knowledge and self-esteem.
While the child may suffer the loss of the parent because of death, there may be at least the hope of reconciliation with his or her extended family and what one would expect to be emotional support for that "innocent", but also the possibility of financial support to assist the child in the preparation for the future which is for our future.
The fair prosecution of this paternity action does not necessarily depend upon the continued existence of Michael Welch. See General Statutes § 52-599 (c)(2).
Therefore, the plaintiff's paternity action is preserved against the administrator of Michael Welch's estate.
In consideration of the scientific techniques available to determine paternity, this court will not deny Kaitlyn the right to prove her paternity so that she may equitably share in her father's estate. The defendant's motion to strike denied.[10]